# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 18, 2008 Session

## STATE OF TENNESSEE v. ANITA KAY BROUGHTON

### Direct Appeal from the Criminal Court for Claiborne County
### No. 12937    E. Shayne Sexton, Judge

_____

### No. E2007-02533-CCA-R3-CD - Filed March 13, 2009

_____

A Claiborne County jury convicted the Defendant, Anita Kay Broughton, of one count of premeditated first degree murder. The trial court sentenced her to life in prison. The Defendant appeals, contending that: (1) the State presented insufficient evidence of premeditation; (2) the trial court abused its discretion when it did not admit a DVD video of the crime scene; (3) the trial court erred when it did not admit prior inconsistent statements of witnesses; and (4) the prosecuting attorney improperly argued that the Defendant had previously raped one of the witnesses. After a thorough review of the record and the applicable law, we affirm the trial court's judgment.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Benjamin S. Presnell, Tazewell, Tennessee, for the Appellant, Anita Kay Broughton.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Renee W. Turner, Assistant Attorney General; William Paul Phillips, District Attorney General; Jared Effler, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### I. Facts

This case arises from a stabbing death that occurred on December 21, 2005. The Defendant was charged with premeditated first degree murder for the death. At trial, the following evidence was presented: Melvina Suttles, a friend of the Defendant and Linda

Robertson, testified that on December 21, 2005, the Defendant invited her "to party . . . for a little while" at the trailer home the Defendant shared with Rick Ellison, the victim. Suttles reported that they drank and did drugs in the living room. Suttles then said, "And that's pretty much the last thing I remember, sitting on the sofa in her living room. And when I came to, I was naked in their bedroom." She said she was awakened by someone fondling her. At that point, she "went ballistic . . . and tried to leave." Suttles testified the Defendant became angry when Suttles tried to leave, and, subsequently, the Defendant and the victim began arguing. Suttles said, "[The Defendant] told me I did not have to leave and she didn't want me to leave, and [the victim] told [the Defendant] just to leave me alone and let me go." Settles testified that the Defendant then stabbed the victim multiple times with a knife with a four- to six-inch blade. Suttles said she did not see a hammer or a screwdriver. The victim pushed the Defendant away from himself, and then the Defendant pushed Suttles into the hallway. Suttles, who was still naked, ran to Robertson's house and told Robertson to call 9-1-1.

Suttles stated that she did not see the victim stab the Defendant. She also had never witnessed the victim assault, threaten, or "pull a weapon on" the Defendant. She did not remember anyone touching the curtains in the bedroom. Suttles said the Defendant referred to the victim as "Nigger," but she thought it might have been his nickname. Suttles recounted that the Defendant "was always saying things about [the victim], like she – she needed to get rid of him or get away from him or something like that." Suttles acknowledged that she originally told the police she was not in the back bedroom when the stabbing took place. Referring to the stabbing, Suttles stated the Defendant stabbed the victim two to three times, even while he was "trying to turn away from her . . . ." Suttles admitted to being under the influence of alcohol, marijuana, and xanax on the night of December 21, 2005, and she had a cut on her finger but did not know how it happened.

Suttles said that, when she ran to Robertson's door, Robertson let her in and washed the blood off of Suttles's face and hands. Robertson gave Suttles some clothes to wear. Then, the Defendant "just stomped on the door and came through the door" wanting "someone to help haul the body away." Robertson told the Defendant she would not help, and then Robertson called 9-1-1. Suttles said the Defendant then tried to run away, but Suttles "tackled her and brought her back in the house." Suttles recalled that the Defendant's hair, shirt, and shoelaces were covered in blood.

On cross-examination, Suttles said she, Robertson, and the Defendant went Christmas shopping in Tazewell and Middlesboro the day of the killing. They went to the Walmart and the Dollar Store, but they did not buy anything. Suttles did not remember stopping at a bar, but she thought it was "probable" that they stopped at a pharmacy. Suttles explained that any inconsistencies between her previous statements to the police and her testimony was because she was under the influence of drugs when she talked to the police. She did not remember how many xanax she took the day of the killing.

Suttles said that she remembered the Defendant and victim "talking and stuff and walking back and forth through the house." They then "shoved[d] each other back and forth." Suttles also said she did not remember taking off her clothes in the bedroom at the Defendant's

trailer; she believed that someone took her clothes off against her will. Suttles denied ever having sexual relations with the Defendant, and she did not remember a sex toy being in the bed. Suttles said that the Defendant had a knife with her in the bedroom.

Linda Robertson, the Defendant's neighbor, testified that she had known the Defendant for five to seven years and had known the victim for sixteen to eighteen years. The victim lived with the Defendant in the trailer below Robertson. Robertson said the victim worked on cars and was in construction; the Defendant did not work.

Robertson said she was asleep on her couch on December 21, 2005, when she was awakened by someone knocking on her door and yelling for help. She opened her door and saw Suttles standing there naked with blood smeared on her hands and face. Suttles told Robertson that the Defendant was stabbing the victim. Robertson washed Suttles and put clean clothes on her. Ten to fifteen minutes later, the Defendant "fell through the door." Talking about the Defendant, Robertson said, "She was covered in blood and she fell on the floor, and she said, 'He's dead. You've gotta help me get rid of the body.'" Robertson said that the Defendant was not calm. While Robertson called 9-1-1, the Defendant left the house.

Robertson stated that the Defendant did not want the paramedics there because she did not want to be arrested for being drunk. Robertson had heard the Defendant previously say "she could kill anybody and get away with it." The Defendant explained that "she dr[ew] a crazy check and she might pull six or eight months in a crazy house and that would be it." Robertson said the Defendant always carried a knife that had a five- to six-inch blade that folded into the handle.

Speaking of the Defendant and the victim's relationship, Robertson said, "They got along, I thought great." She did not know of the victim ever striking or threatening the Defendant. She acknowledged that the couple fought "but within five or ten minutes, everything was fine." Robertson did say that the victim became "argumentative" when he drank.

On cross-examination, Robertson said that she, Suttles, and the Defendant went Christmas shopping earlier in the day. While out, they stopped at a bar to see Robertson's friend, but he was not at the bar. That night, when Suttles came to her home, Robertson washed the blood off Suttles with a rag. Robertson described the Defendant's demeanor as "scared," which, Robertson said, was how the Defendant "always acted."

Special Agent James Whitson with the TBI testified that he investigated the crime scene. He stated that there were three scenes: (1) the Defendant's home where the body was stabbed; (2) the van that was parked between the Defendant's and Robertson's homes; and (3) Robertson's home, where Suttles and the Defendant went after the stabbing. Agent Whitson stated that there was blood in the van on the driver's seat and on the arm of the passenger seat. Agent Whitson spoke with the Defendant, who was not handcuffed, at the hospital, and she consented to a search of her house and to give a blood sample. Agent Whitson also took the Defendant's clothes as evidence. The Defendant then went with Agent Whitson to the Criminal

Investigation Division ("CID") of the Sheriff's Department, where she waived her *Miranda* rights and gave a statement. Agent Whitson read that statement into evidence:

This is a statement of Anita Broughton given to TBI Agent James Whitson in Claiborne County and Detective Rick Davis on . . . 12-22-05 at the Claiborne County CID office.

On 12-21-05, Melvina Suttles, Linda [Robertson] and I went out partying. We started out at Sam Owens'[s] store. Linda drove Melvina and I . . . around. We were drinking liquor and beer. Melvina and I started kissing each other. It made Linda a little mad. Just after dark, Linda stopped at the Straight Branch Bar. Linda went in and saw her boyfriend, Timothy Howard. While Linda was in the bar, Melvina and I continued to kiss and make out. Linda was inside about 15 minutes. When Linda came out, she took me and Melvina to my house at 351 Boone Hollow Road in Speedwell.

When Melvina and I got out of the car, Melvina asked me if my boyfriend, Rick Ellison, would like to have a threesome. Rick lives with me at my house, and Rick had been talking about having sex with two women. I told Melvina we would find out if he wanted to or not. We went in – we went in the trailer. Rick was sitting on the love seat by the door. Melvina and I asked Rick if he wanted to have a threesome. I believe he thought he were kidding – I believe we – he thought we were joking. Melvina and I started kissing again and making out. We started toward the back bedroom, and Rick said, "Well, why the hell not." He followed us to the bedroom.

Melvina and I got to the bedroom and we took off our clothes. Rick came in the room and watched us make out. Rick watched Melvina and me have sex for a little while. Then he left and went and took a shower. Melvina and I continued in the bedroom. Rick come out of the shower and joined us. We were all three having sex together. Melvina and I got a vibrator out and started using it on each other. During all the flopping around, we tore down the curtain in the bedroom. Rick was sitting on the bed with his head in his hands. Rick was drinking something.

I didn't want the neighbors to see us all having sex, so I got out a little screwdriver and hammer to put up the curtain – to put the curtain back up. Rick started cussing saying things like, "I'm over this shit." He told me that he didn't want me fucking anyone else. I don't know when Rick went to the kitchen and took a silver knife. Melvina and I had our back to the bed putting up the curtains when all of a sudden Rick started slicing me on the back of my right lower leg. I turned around and tried to stop him, and he stabbed me in my right hand. He also sliced me on my upper right leg. There may be some marks on my left leg.

-4-

Melvina saw Rick cutting me, and she hit him with the hammer. It all happened so fast that . . . I don't know how many times Melvina hit Rick. I believe she was trying to get Rick to stop cutting me.

There was blood everywhere. I don't remember anyone saying anything. After Melvina stopped hitting Rick, she ran out of the room naked. I believe she ran all the way to Linda [Robertson's] house naked.

Linda [Robertson] lives just up the road a little ways. After Melvina ran out, I grabbed Rick by the shoulder and shook him. He wasn't moving. I thought that he was dead. I grabbed some clothes and put them on and jumped in Rick's van and tried to drive to Linda's house. The van stopped and wouldn't go anymore, so I jumped out and ran up to Linda's. When I went in, Melvina was in the floor flopping around and I fell onto the floor. I told Linda that I thought Rick was dead. Linda called 911. I don't know what she said to them. A few minutes later, everyone started arriving, and I was taken to the Claiborne County Hospital.

Agent Whitson testified that the Defendant was free to leave at any time while she was at the Criminal Investigation Division ("CID") and that he did not plan to charge her. He said the Defendant stayed awhile longer, and she then gave a second statement, which Agent Whitson also read into evidence:

This is the second statement given to TBI Agent James Whitson and Detective Harrison Cornett at the CID office on 12-22-05 at 6:35 a.m., by Anita Broughton.

I remembered a few more details concerning Ricky Ellison's death. When Ricky started cutting me, I remember we fought for a few minutes. I grabbed the small screwdriver that we were putting the curtain up with. I stabbed Ricky at least one time. I can't remember if I stabbed him any more or not. I'm having a flash of memory that I might have stabbed him more than that one time.

I remember Sissy, who is Melvina, threw the hammer that we were working with and hit Rick with it. Sissy ran out of the house naked screaming. I grabbed the hammer and hit Rick three or four more times. I told Rick, "You won't hurt me anymore." Then I noticed Rick wasn't moving. I didn't mean to kill Rick, it just happened. I grabbed his shoulder and tried to shake him, but he didn't move.

My hand was still bleeding so I went to the bathroom to get a towel. I wrapped my hand up. I noticed blood in the floor and I tried to clean up – I tried to clean the floor up.

I was so scared, I ran out of the house and jumped into Rick's van. I drove it a little ways toward Linda's house and then stopped. I ran to Linda's and

-5-

fell through the door. I saw Sissy in the floor, and I told them I thought Rick was dead. I told Linda I thought I had stabbed Rick. I told her to call 911.

All the other stuff in the first statement is true except for where I left out the part where I stabbed and hit Rick with the hammer.

I went to Dr. Day's office last month and saw Dr. Teresa. She told me I needed to go back on – she told me I needed to go back to Cherokee Mental Health. She thought I needed to be taking all my medication. I quit taking it back around 2003. The pills were for my blackout spells. Sometimes I black out and don't remember what happened.

Back in 2003, I was ordered by Campbell County Court to be – to go to Cherokee Mental Health. Cherokee Mental Health gave me medication, but I stopped taking it. I thought I would be all right without it. Even though the doctor told me to go back last month, I didn't.

Back around September of 2005, after Rick got out of jail, we had been living together about a month. Rick choked me until I passed out. He woke me up and told me that he wanted to kill me because I had been with someone else while he was in jail.

A few weeks ago we were at my house with Aubrey Drummonds. Aubrey's daughter Rhonda was there. Rick asked her to suck his dick, and I told him not to do that. Rick jumped up and said, "If you ever talk to me that way again, I will beat your Goddamn brains out." Aubrey took Rhonda and I out of the house, and we left until Rick passed out.

Linda heard Rhonda, Aubrey, and I talking about this so she knew it happened. I have been with Rick on and off for about five years. I did not mean to kill him, it just happened.

After reading the Defendant's statement into evidence, Agent Whitson said that he collected biological samples from each of the Defendant's fingers and from Suttles. In addition, he took a fake fingernail found in the hospital bathroom after the Defendant used it. Describing what he saw when he went to the Defendant's trailer, Agent Whitson said he noticed that the curtains were hung and that the victim's body was lying in a fetal defensive position. Agent Whitson also saw blood on the curtain side of the bed.

On cross-examination, Agent Whitson said he was dispatched around 10:30 to 11:00 p.m. on December 21, 2005. He said he arrived before the Violent Crime Response Team ("VCRT"). At the Defendant's house, Agent Whitson recovered a fingernail by the stove, a bloody rug, and a rag. He said that, when he spoke with Suttles, she told him she was intoxicated, and he said, "Yeah, you could tell she was on something." Agent Whitson said he found marijuana and pills, but he did not find any screwdrivers, nails, vibrators, or syringes. He also did not find a knife.

-6-

He clarified his previous testimony that the Defendant returned to the CID of her own free will to give her second statement. Agent Whitson said he was "sure" the Defendant had been drinking and taking medication on the day he saw her. Agent Whitson stated that Suttles made two or three statements and that Robertson made two statements.

On redirect, Agent Whitson read the toxicology report into evidence, which reflected that the Defendant had diazepam and noradiazepam in her system. The victim did not have any drugs in his system.

Sergeant Robert Chadwell with the Claiborne County Sheriff's Department testified that he was on duty on December 21, 2005, and that he was dispatched to a domestic situation involving a knife. He arrived at Robertson's home and spoke with the Defendant, who "seemed kind of hysterical." Sergeant Chadwell said the Defendant had cuts on her hand and "blood throughout her hair and face area." Suttles was also at the home, and she looked as if she had just showered. Sergeant Chadwell said the Defendant told him she was assaulted by the victim, who the Defendant said was "at his residence, possibly armed and intoxicated and maybe even passed out." Sergeant Chadwell then went to the victim's home, where the front door was open, but no one responded to Sergeant Chadwell's yelling. He saw blood throughout the carpeted areas. He also saw a large rottweiler dog, which ran to the kitchen when he entered the house. Sergeant Chadwell said there was a lot of blood in the bathroom, and he spotted a "bloody hammer and . . . screwdriver laying just before the [bedroom] door." Upon opening the door, Sergeant Chadwell saw the victim lying dead on the bed. Sergeant Chadwell said he never saw a knife.

On cross-examination, Sergeant Chadwell said he saw the cuts on the Defendant's right hand. He clarified that the other police officers told him that the Defendant said the victim assaulted her. Sergeant Chadwell stated that there was blood throughout the living area and into the hallway. He said it looked as if someone had tried to clean up certain spots of blood.

Agent Denise Morrissey with the TBI Crime Lab testified that she led the VCRT team in processing the crime scene. Because of the coldness and the darkness, they began by videotaping and photographing the scenes. They found the hammer and screwdriver on the floor in the Defendant's home; they found the screwdriver in the hallway. Agent Morrissey said that in the Defendant's home, she found a blue Adidas jacket on an armrest with Suttles's wallet inside the pocket. They also found size a XL blue sweatshirt with a white T-shirt tucked inside of it. Furthermore, VCRT found a smaller white T-shirt and a white sweatshirt with a purple bra, size 38C. Individual clothing items included a medium white T-shirt, a pair of size small women's underwear, a pair of size 7 jeans with a rust brown stain on them, and a pile of clothes on top of the washer and dryer. They also found a fake fingernail by a wood stove at the Defendant's house. Agent Morrissey described the bathroom by saying, "Upon looking inside the bathroom, there was a lot of – a great amount of reddish brown stains that had the appearance of being swiped/wiped. There were also some blood drops on the toilet seat, and the blood that was in the bathroom floor was pretty much almost covering the entire floor and there was also blood droppings on the cabinet and near the sink." She also said that there was an "empty cylindrical roll . . . completely void of whatever was rolled up on it and it was in the toilet. The

toilet was also tinged pink as if blood were in – also in there . . . ." Agent Morrissey saw blood smears on the sink's rim, on doorknobs, and on the linoleum walkway in the house. She stated she also saw a cellophane cigarette wrapper with reddish brown stains on it. Agent Morrissey found fake fingernails by a chest of drawers and in the bedding. She said that one side of the bed did not have any blood on it.

Agent Morrissey stated that, when the VRCT processed the van, they found blood on the driver's and passenger's seats and blood spatters between the console. There were also "light smears" of blood on seat backs.

On cross-examination, Agent Morrissey testified that she knew a dog had been in the trailer before they processed the scene. She agreed that the dog could have "lapped up some of that blood." They also found a fake fingernail at Robertson's house and at the head of the victim's body in the bedroom.

Tammy Reagan, a deputy with the Claiborne County sheriff's office, testified that she met the Defendant while working at the jail on December 22, 2005. She said she took pictures of both the Defendant and Suttles in order to document any injuries. The Defendant had bruising, and her right hand was already bandaged. Deputy Reagan said the Defendant had a scratch on her right calf similar to "a briar scratch." She described the Defendant as "nervous" and "smoking a cigarette." Deputy Reagan did not remember any deep wounds or cuts on the Defendant. She said it was possible the Defendant had bruising around her breasts. She said that Suttles "had just a few little places on her hands."

Dr. Barry Stewart, the emergency room doctor at Claiborne County Hospital who treated the Defendant, testified that the Defendant had "fairly mild" injuries on the inside of her right thumb. The Defendant told him that she was home alone when she was attacked by a stranger, and she mentioned that she engaged in sexual activity with two other people. Dr. Stewart said he could not find evidence that the Defendant was stabbed on her upper right leg, like she claimed. On cross-examination, Dr. Stewart described the Defendant as "excited" and possibly distraught. Later, he said she was "upset."

Registered Nurse Angela Lynn Taylor from the Claiborne County Emergency Room testified that she treated the Defendant. She said the Defendant had small superficial scratches, which did not explain how the Defendant was covered in blood. Nurse Taylor only cleaned the Defendant's right side, including her thumb. She said that the thumb injury did not require any stitches. Nurse Taylor said that she was initially told the Defendant had been involved in a domestic assault, so her notes originally described the wounds as defensive.

Dr. Sandra Elkins, a forensic pathologist and the medical examiner for Knox county, testified that she received the victim's body for an autopsy. She found two lacerations (tears in the skin indicative of blunt force) on the victim's forehead, one of which caused an underlying skull fracture; one superficial laceration in the right eyebrow area; one superficial laceration under the left eye; one laceration on the left side of the head, which caused an underlying skull fracture; one laceration in front of the lower part of the left ear; three lacerations on top of the

head; and one laceration on the back of the head, which penetrated the skin down to the skull. Dr. Elkins also found superficial puncture wounds on the back of the victim's head. Discussing the victim's five chest wounds, Dr. Elkins stated: wound "A" entered the front of the victim's chest and completely cut the right internal jugular vein; wound "B" entered the upper chest and perforated the left lung and the heart, which caused bleeding into the sac surrounding the heart; wound "C" was in the front of the chest going downwards, and it cut the pulmonary artery at its origin from the heart and the pulmonic valve in the heart; wound "D" entered the left of the chest, and it ended in fat tissue that covers the sac around the heart; and wound "E" was also in the front left of the chest, and it hit the muscular tissue of the left chest wall. Dr. Elkins also found a "large gaping cut wound of his left arm near the elbow region." She also recovered a "pinkish red, fake fingernail . . . from the victim's right back of the armpit region."

Dr. Elkins concluded that there were at least three weapons used and that the victim would have died in five to ten minutes. She stated that there was evidence of a "minimum of seven to eight blows to the head" with the hammer and a "minimum of five . . . Phillips pattern type injuries to the scalp." The stab wounds on the chest and the wound on the elbow were consistent with knife wounds. "The cause of death was multiple, sharp force and blunt force injuries."

On cross-examination, Dr. Elkins said that the wounds could have been committed with more than three weapons and that she could not determine the number of people wielding the weapons or determine the sequence of the wounds.

Michael Turberville, a serologist with the TBI Nashville Crime Lab, testified that he determined the Defendant's and the victim's blood was on the claw hammer. The blood on the screwdriver matched the victim. Turberville said that the underside of the fingernail found on the floor of the bedroom had DNA evidence, but no blood, that matched the Defendant and Suttles. The swabs taken from the bathroom matched the Defendant and the victim's DNA. The swab taken from the front door of the neighbor's house matched the Defendant, as well as the fingernail found at Robertson's house and the driver's seat in the van. Swabs from the left hand of the Defendant were a positive match for blood and DNA from the Defendant, the victim, and Suttles, while swabs from the Defendant's right hand only matched the Defendant. The fingernail found on the emergency room bathroom floor had DNA from the Defendant and a partial profile of the victim; the fingernail on the back of the victim had the victim's DNA on it. On cross-examination, Turbeville acknowledged that only some of the evidence was tested for DNA profiling.

Hoyt Eugene Phillips, a latent fingerprint examiner with the TBI, testified that he analyzed the hammer and the indoor door handle of the Defendant's house. He could not get any prints "of value" from either piece of evidence.

Rhonda Drummonds, a neighbor of the Defendant and the victim in 2005, testified that she saw the Defendant and the victim together. Drummonds said she did not ever see the victim attack or assault the Defendant. She also denied that the victim had ever asked her to "suck his dick" or threatened the Defendant for telling him not to request such an act.

The Defense then presented Bill Davidson, a member of the Eighth Judicial District Drug Task Force, who was the first official to arrive on the scene on December 21, 2005. Davidson said that he first saw the van, which was pointed towards the dead end of the road, where Robertson lived. After making sure no one was in the van, he proceeded to Robertson's house, where Robertson, Suttles, and the Defendant waited on him. He interviewed Robertson, who gave him two official statements. The first statement was given around 11:13 p.m., and she gave the second statement at 6:30 a.m., which was after the police found the victim's body. Robertson told Davidson that the victim and the Defendant "fuss[ed] and f[ou]ght all the time." She described the victim as "violent" when he drinks. She acknowledged that she had never seen marks on either of them. Robertson recalled that the Defendant and the victim fought two days before the night at issue.

Robertson then told Davidson that, on December 21, 2005, Suttles came to her house, and they talked for awhile. Then Suttles went to the Defendant and the victim's trailer. When Suttles returned to Robertson's house, she was "beating and hollering at [her] front door" and "[Suttles] had blood all over her hands and arms." Richardson said Suttles told her, "[G]et some help. [The victim] is stabbing [the Defendant]."

Davidson testified that in Robertson's second statement to him, she said the victim's "temper flare[d] up sometimes over nothing." She also said, the Defendant "came through [her] front door and fell down on the rug. [The Defendant] said, 'I've stabbed [the victim].'" The Defendant also claimed to Robertson that she was "bleeding to death." Robertson said that the Defendant explained the situation by saying, "We were getting ready to have an orgy and Rick shows his damned ass."

On cross-examination, Davidson said that Robertson never specifically said the victim hit the Defendant. She also did not "indicate" to Davidson that she had seen the victim "become physically violent toward [the Defendant]." Davidson said that, when he talked with the Defendant, he thought she was "extremely intoxicated" and that she kept saying that "she was drowning in her own blood," but he could not see any injury to her. Davidson said that, when Robertson gave him her second statement, she prefaced it with, "When I gave the statement to you earlier, I may have left out a few things. I'm telling you as I remember, I was really scared." Robertson also recounted in her second statement that the Defendant "said she had tried to get away in the van, but it quit on her and wouldn't run." The Defendant "kept wanting to run away" and asked Robertson to "help . . . get rid of the body." The Defendant also told Robertson that she "couldn't go to jail." Davidson then related that Robertson told him "If [the Defendant] finds out I told you this, she will kill me or burn me out. I get cold chills just thinking about it." Davidson said when he was at the CID the next morning, he saw the Defendant with her head resting on a desk while being interviewed by the TBI.

Aubrey Drummonds, the owner of the mobile home the Defendant and the victim rented, testified that he found a blue dildo on the bed in the mobile home, half-way under a pillow. He said it was in plain view. He also found a straight razor under the couch in the living room when the Defendant's brother came to remove the furniture. Drummonds removed the bloody sheets and mattress and burned them.

On cross-examination, Drummonds said he saw the Defendant and victim together a lot, and he never saw any violent activity between the two. Drummonds testified that he disposed of the dildo. He said that he was cleaning up the trailer soon after the incident because he owned it and the court put him in charge of the Defendant's dog, which was still at the trailer.

The Defendant then showed the jury her right hand to let them see the wound to her thumb.

Charles Broughton, the Defendant's brother, testified that he had known the victim for fifteen to twenty years. He learned of the victim's death via television. Broughton testified that his sister has a disability. While he removed her furniture from the trailer, he found a bolt of a .22 single shot rifle under a couch cushion in the living room and the rifle itself in a small room off the living room.

The Defendant chose not to testify. After hearing the evidence presented, the jury convicted the Defendant of premeditated first degree murder. The trial court sentenced her to life in prison. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the State presented insufficient evidence of premeditation; (2) the trial court abused its discretion when it did not admit a DVD video of the crime scene; (3) the trial court erred when it did not admit prior inconsistent statements of witnesses; and (4) the prosecuting attorney improperly argued that the Defendant had previously raped one of the witnesses.

### A. Sufficiency of the Evidence

The Defendant claims that the evidence presented was not sufficient to prove premeditation. The State disagrees.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn.

1956). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (*State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

First degree murder is the premeditated and intentional killing of another. T.C.A. § 39-13-202(a)(1) (2003). "Premeditation" is defined as "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2003). Whether a defendant acted with premeditation is a question of fact for the jury to determine, and it can be inferred from a number of circumstances, including the following: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660. An "intentional" killing is one committed by a person "who acts intentionally with respect . . . to a result of the conduct when it is the person's conscious objective or desire to . . . cause the result." T.C.A. § 39-11-302(a) (2003).

In this case, after considering the facts in the light most favorable to the State, we conclude the Defendant has not met her burden of showing that the evidence was insufficient to prove the premeditation element of first degree murder. The Defendant used a deadly weapon against an unarmed victim: she repeatedly stabbed the victim with a knife and a screwdriver, and the victim was unarmed and found in a defensive fetal position. In addition, the killing was particularly cruel. The Defendant beat the victim with a hammer "a minimum of seven to eight" times on his head, stabbed him at least five times with a screwdriver in his scalp, and stabbed him five times in his chest with a knife. The hammer wounds cracked his skull, and the knife wounds cut his jugular vein, perforated his lungs, and cut the pulmonary artery in his heart. The

-12-

Defendant also expressed declarations of needing to "get rid" of the victim, while also proclaiming that she could kill anyone and get away with it because she "drew a crazy check." These facts support the jury's finding of premeditation. The Defendant is not entitled to relief on this issue.

## B. Admission of Video Tape

The Defendant argues that the trial court erred when it refused to admit the DVD of the crime scene because the DVD was relevant and probative. The State argues that with the numerous photographs of the crime scene already admitted into evidence, the DVD would have been cumulative.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Generally all relevant evidence is admissible except as provided by . . . [the] rules [of evidence]." Tenn. R. Evid. 402. One such exception to the admissibility of relevant evidence is if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The admissibility, relevancy, and competency of evidence are matters entrusted to the sound discretion of the trial court. With that principle in mind, we review the trial court's evidentiary rulings for an abuse of discretion. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Gray*, 960 S.W.2d 598, 606 (Tenn. Crim. App. 1997).

The pertinent testimony concerning the DVD of the crime scene is as follows:

A [Agent Morrissey]: A lot of times we will do an initial walk-through, but in this particular case, the video was done before our team did a walk-though.

Q [Defense Counsel]: And were you the agent on the video during the walk-through?

A: I actually did the video, yes.

Q: Yes, Okay. I thought that was your name.
[Then to trial court]: If I may, your Honor, I'd like to show the video to the Jury. . . .

The Court: The video of the – of the – after all these photographs have come in, you show the video? Denied.

Defense Counsel: There's a substantial amount of sound on the video.

The Court: Denied.

The Defendant argues that the DVD corroborated key pieces of defense evidence, including a barking dog and a gun leaning against the wall. A review of the testimony shows that the issues of a dog being at the home and a gun leaning against the wall were not contested. Aubrey Drummonds and Sergeant Chadwell testified about the dog being present. Charles Broughton testified about the gun in the house. None of the witnesses gave conflicting testimony about those facts. Also, evidence concerning the dog and the gun was not determinative of guilt or innocence in this case. As for any other evidence on the DVD, we conclude it would have been cumulative considering the numerous photographs of and extensive testimony about the crime scene. As such, the trial court did not abuse its discretion when it did not admit the DVD into evidence. The Defendant is not entitled to relief on this issue.

### C. Admission of Prior Inconsistent Statements

The Defendant argues that the trial court abused its discretion when it denied the admission of prior inconsistent statements by Suttles and Robertson. The State contends that: (1) the Defendant waived the issue on appeal for failure to cite to the record; (2) the Defendant waived the issue on appeal for failure to raise it in her motion for new trial; and (3) the Defendant actually introduced the prior inconsistent statements through a defense witness.

In Tennessee, "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(e). After a careful review of the transcript of the hearing on the motion for new trial, we agree with the State that the Defendant did not raise this as an issue in her motion for new trial. As such, the Defendant has waived this issue for review, and she is not entitled to relief.

### D. Closing Argument

The Defendant argues that the prosecuting attorney improperly argued that the Defendant had previously raped one of the witnesses. The State argues that the Defendant did not contemporaneously object and has not proven the five requirements for plain error.

The statement at issue occurred when the State, in its closing argument, began discussing the fingernail found at the foot of the bed that had the Defendant and Suttles's DNA, but not their blood, on it. The State said, "Somebody raped Melvina Suttles on this bed. There's no blood on this fingernail, but there is Melvina Suttles'[s] genetic material. What does that tell us? That something happened sexually to Melvina Suttles, and it was the defendant that did it."

The Defendant acknowledges that he did not contemporaneously object to the statement. Relief is not required when "a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). As such, the issue is waived, and it may only be considered for plain error. *See* Tenn. R. Crim. P. 52(a).

Whether an issue rises to the level of plain error is a decision that lies within the sound discretion of the appellate court and may be considered: (1) to prevent needless litigation; (2) to prevent injury to the interests of the public; and (3) to prevent prejudice to the judicial process, prevent manifest injustice, or to do substantial justice. *See* Tenn. R. App. P. 13(b); Tenn. R. Crim. P. 52(b); *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (adopting *State v. Adkisson*, 899 S.W.2d 626, 638-39 (Tenn. Crim. App. 1994)). In *Adkisson*, this Court stated that the following factors should be considered by an appellate court when determining whether an error constitutes "plain error": (a) the record must clearly establish what occurred at the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the issue is "necessary to do substantial justice." *Adkisson*, 899 S.W.2d at 641-42 (citations omitted). Our Supreme Court characterized the *Adkisson* test as a "clear and meaningful standard" and emphasized that each of the five factors must be present before an error qualifies as plain error. *Smith*, 24 S.W.3d at 282-83.

"Courts have recognized that closing argument is a valuable privilege afforded to the State and the defense and have afforded wide latitude to counsel in arguing their cases to the jury." *State v. Cleveland*, 959 S.W.2d 548, 551 (Tenn. 1997) (citing *State v. Bigbee*, 885 S.W.2d 797, 809 (Tenn. 1994)). Tennessee Rule of Criminal Procedure 29.1(b) allows a closing argument to address any evidence introduced at trial. In addition to argument based on the evidence presented, attorneys may also argue "reasonable inferences." *State v. Chico McCracken*, No. W2001-03176-CCA-R3-CD, 2003 WL 1618082, at \*8 (Tenn. Crim. App., at Jackson, Mar. 24, 2003), *perm. to appeal denied* (Tenn. Sept. 2, 2003). When there is improper argument, the court must test whether the inflammatory statement negatively impacted the Defendant. To measure this impact, five factors should be considered: "(1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case." *State v. Goltz*, 111 S.W.3d 1, 5-6 (Tenn. Crim. App. 2003).

Additionally, we have recognized five general areas of prosecutorial misconduct: (1) intentionally misstating the evidence or misleading of the jury on the inferences it can draw; (2) expressing personal beliefs or opinions; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) adding outside issues to the guilt or innocence issue; and (5) arguing or referring to outside facts. *Id.* Of course, if the court took curative measures, such as proper jury instructions, such measures will likely render the misconduct harmless. *McCracken*, 2003 WL 1618082, at \*8 (citing *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993) for the proposition that "[i]n the absence of compelling prejudice, proper instructions will generally suffice 'to cure any risk of prejudice' when one defendant's counsel argues that the codefendent is the guilty party.").

We acknowledge that the State's reference to a crime that the Defendant was not charged with nor on trial for was improper. We, nonetheless, conclude that the remark did not rise to plain error. The State presented a very strong case against the Defendant. Its evidence included the Defendant's own admissions to Officer Whitson that she had stabbed and killed the victim,

eye witness testimony by Suttles that the Defendant stabbed the victim several times, and testimony from Robertson and Suttles that the Defendant admitted killing the victim. The victim was beaten with a hammer and stabbed repeatedly with both a screwdriver and a knife in the home that he shared with the Defendant. The Defendant had expressed a desire to "get rid" of the victim. Considering the strength of the evidence against the Defendant, she has not shown that the statements made in the State's closing argument affected the verdict to her detriment. *See generally State v. Farmer*, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996). Moreover, the trial court instructed the jury that "[s]tatements, arguments and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them." Thus, the jury knew that the prosecutor's comments were not evidence and could be disregarded when considering the guilt and innocence of the Defendant with respect to the first degree murder charge. *See id.* at 592. We conclude that the statement made during closing argument was not reversible error, and, therefore, no clear and unequivocal rule of law was breached. The Defendant has not proven plain error, and she is not entitled to relief on this issue.

### III.  Conclusion

After a careful review of the record and the applicable law, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE